UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

KRISTINE MITCHELL
    Plaintiff,

vs.

MICHAEL J. ASTRUE,
COMMISSIONER OF SOCIAL SECURITY,
    Defendant.
_____/

Case No. 08-13301

DISTRICT JUDGE GERALD E. ROSEN
MAGISTRATE JUDGE STEVEN D. PEPE

## REPORT AND RECOMMENDATION

### I. BACKGROUND

Plaintiff brought this action under 42 U.S.C. § 405(g) to challenge a final decision of the Commissioner denying her application for Disability Insurance Benefits (DIB) under Title II of the Social Security Act. Both parties have filed motions for summary judgment, which have been referred pursuant to 28 U.S.C. § 636(b)(1)(B) and (C). For the following reasons, it is **RECOMMENDED** that Plaintiff's motion for summary judgment be **DENIED** and the Defendant's motion for summary judgment be **GRANTED**.

#### A. Procedural History

Plaintiff protectively applied for DIB on January 26, 2004, alleging that she had been disabled since July 21, 2003 (R. 53-56).[1] After Plaintiff's claim was initially denied on May 14, 2004, (R. 31-35) a hearing was held on September 5, 2006, before Administrative Law Judge Lubomyr M. Jachnycky ("ALJ") (R. 285-307). Plaintiff was represented by attorney George E. Borgelt. Vocational Expert Jennifer Turecki ("VE") also testified (R. 302-306).

---

[1] Plaintiff previously filed an application for DIB on September 3, 2002, alleging disability since June 28, 2002. The claim was initially denied on October 15, 2002 and was not appealed. It is not reopened and has therefore become final.

In an October 24, 2006, decision, ALJ Jachnycky concluded that Plaintiff was not under a disability as defined by the Act because Plaintiff was capable of making a successful adjustment to work that exists in significant numbers in the national economy (R. 13-23).  On February 1, 2008, the Appeals Council denied Plaintiff's request for review, thus making it the final decision of the Commissioner (R. 7-9).

**B.     Background Facts**

**1.     *Plaintiff's Hearing Testimony***

Plaintiff was 39 years old at the time of the hearing (R. 288), and lived with her husband and son (R. 290).  She received her General Education Development (GED) certificate in 1992 (R. 72).  Plaintiff currently receives no income, and relies on her husband for support (R. 288).  She has a driver's license and typically drives once per week (R. 289).

As for her daily activities, Plaintiff typically wakes at 10:00 in the morning and plays with her son or watches T.V. with him until her husband arrives home at about 2:30 in the afternoon (R. 290).  Plaintiff does light work around the house, such as dusting and picking things up, but her husband takes care of all the heavier chores including cooking, vacuuming and laundry (R. 290-291).  Plaintiff has no hobbies or interests, other than reading (R. 289, 291).

Plaintiff last worked in July of 2003 (R. 291).  Plaintiff had earnings of over $60,000 in 2004, although approximately $50,000 of that was from a buyout, and the remainder was for employer-paid disability payments she collected through May 2004 (R. 292).  She indicated that she enjoyed working and would like to work again (R. 300-301).

Plaintiff had ligament repair surgery performed on her right wrist in 2004, but that it did not get rid of her pain (R. 292, 297-298).  On a scale of ten, she rated her pain at a seven, with

daily "outbreaks" where the pain level increased to ten (R. 296, 298-299). Plaintiff stated that even when she experienced these increases in pain she did not go to the emergency room because she was told by her doctors that there was nothing they would be able to do for her (R. 299). During the relevant time, Plaintiff received approximately six cortisone injections for the pain (R. 293). She takes 600 mg and 800 mg doses of ibuprofen daily (R. 297). Plaintiff testified she must lie down a few times a day for anywhere from 20 to 60 minutes because of the pain (R. 299-300).

Plaintiff is right-handed, but she uses her left hand to perform most tasks, including eating, drinking and taking a shower (R. 293, 295). She wears a brace on her right wrist (R. 295). She can lift 20-25 pounds with her left hand, but claims she cannot lift a coffee cup with her right (R. 295-296). Plaintiff does not have any problems with sitting, standing or walking as long as her right arm is not moving (R. 294).

Plaintiff stated she is depressed because of the pain she experiences (R. 293-294). She has no history of psychiatric treatment, but was prescribed Celexa by her family doctor to treat her depression (R. 293). The Celexa makes her tired, and she has crying spells (R. 294, 298). Plaintiff also takes Synthroid for her thyroid condition (R. 297).

### 2. *Medical Evidence*[2]

Plaintiff was treated for right wrist pain related to repetitive work activities that culminated in a wrist injury in April 2003 (R. 261). On May 12, 2003, an ultrasound of

---

[2] Although the ALJ mentions Plaintiff's history of hypothyroidism and vascular surgery for varicose veins in his decision, Plaintiff does not allege any error regarding the ALJ's consideration of these impairments, and therefore, has conceded any challenge the ALJ's findings in this regard. *See Willis v. Sullivan*, 931 F.2d 390, 401 (6th Cir. 1991).

Plaintiff's right wrist revealed a small ganglion cyst and "ill definition of the triangular fibrocartilage" consistent with degenerative changes (R. 260). On July 17, 2003, Plaintiff visited Paul S. Shapiro, M.D., an orthopedic surgeon (R. 261-262). Physical examination revealed no obvious deformity, and x-rays showed no evidence of acute pathology (R. 261). Dr. Shapiro diagnosed Plaintiff with painful distal radial ulnar joint ("DRUJ") instability of the right wrist (R. 261). Plaintiff started receiving cortisone injections in the DRUJ and wearing a wrist splint (R. 262). A December 2003 right wrist arthrogram showed a triangular cartilage tear at its radial attachment site (R. 260). While 12 pages of Exhibit 3F appear to be missing from Dr. Shapiro's report, (R. 260-262 are three pages of a 15-page exhibit), the ALJ's decision notes, without challenge from Plaintiff's counsel, that Plaintiff underwent wrist surgery – arthroscopic radial-sided triangular fibrocartilage complex ("TFCC") repair – in January 2004 [3] (R. 18).

Dr. Shapiro referred Plaintiff to physical therapy, and on February 17, 2004, Plaintiff visited Sharon Waterstradt, O.T.R., for range of motion and strengthening for her right wrist and hand (R. 267-269). Plaintiff stated that her pain level was four, and that it was two at its best, and six at its worst. She experienced some numbness and tingling in her middle, ring and little fingers, and had difficulty lifting anything heavy. Her symptoms were aggravated by activities that required lifting or gripping, but were relieved by rest. Plaintiff had "a little" or "some" difficulty with several activities of daily living ("ADL"), such as dressing, hair care, writing, and manipulating, but found lifting her three-year-old son and cutting food to be "difficult". Moreover, she required assistance with household chores and was unable to open jars (R. 267). Plaintiff's range of motion was 50 degrees flexion and 40 degrees extension with discomfort.

---

[3] Other medical records reflect the surgery was performed January 14, 2004 (R. 265-267).

The treatment goals were to decrease pain and edema, increase strength, range of motion and function with ADLs, and perform home exercises (R. 268).

From February 17 through March 9, 2004, Plaintiff received seven physical therapy treatments.  By March 9, Plaintiff's range of motion was within normal limits with pain at the ends of the range, especially with wrist extension and extension with resistance.  Plaintiff stated she had increased use of her hand, and was trying to do some spring cleaning, but she was limited due to her pain (R. 266).

On March 14, 2004, Dr. Shapiro noted tenderness at the TFCC region and a possible retear (R. 275).

On March 23, 2004, Dr. Shapiro's examination revealed a full range of motion, and Plaintiff had 5/5 grip strength with pain at the extremes of motion.  She had full supination and pronation without pain.  He recommended that Plaintiff continue with her home exercise regimen (R. 271).

On March 24, 2004, Plaintiff returned to physical therapy reporting an occasional sharp pain in her wrist.  She stated her pain was "almost as bad" as it was prior to surgery.  Plaintiff's range of motion was within normal limits with pain at the end of range.  Ms. Waterstradt noted that Plaintiff was progressing well in terms of functional use and range of motion, but subjective complaints of pain continued.  Ms. Waterstradt also noted that Plaintiff's physician had decided not to continue the physical therapy, so Plaintiff was discharged with her goals partially met and with advice to continue her home exercises and a fair to good prognosis (R. 265).

On April 12, 2004, Plaintiff once again returned to physical therapy.  This time, however, Plaintiff's chief complaint was right-sided neck and shoulder pain, with no treatment of her

wrist.  Midge J. Moran, P.T., noted that Plaintiff was athletically active and played softball and golf.  The treatment plan targeted Plaintiff's neck and shoulder pain (R. 264).

On April 26, 2004, the state agency medical consultant noted that the medical file revealed the January 2004 surgery was healing well, wrist splints were used, and Plaintiff had no complaints.  The doctor determined that Plaintiff's wrist condition had not lasted for 12 consecutive months, and disability was denied (R. 263).

On April 27, 2004, Dr. Shapiro indicated Plaintiff's pain was 5/10 in severity when present, which occurred mostly with use – with no pain when at rest.  A physical examination revealed a full range of motion and 5/5 strength, but there was tenderness at the TFCC region (R. 270).  On August 24, 2004, Dr. Shapiro noted continued tenderness at the TFCC region, but no appreciable instability.  Plaintiff received a cortisone shot (R. 276).  On September 28, 2004, Plaintiff noted that she still had pain in her wrist, but it was tolerable when she took Vioxx.  She also experienced some relief from the cortisone injection.  A physical examination revealed a full range of motion, but there was still tenderness at the TFCC region (R. 275A).

On November 1 and November 3, 2004, Plaintiff was seen at the Beaumont Health Center for an occupational therapy evaluation.  Heidi Wills, O.T.R., noted that Plaintiff had difficulty when performing ADLs including: lifting more than 4.5 pounds from floor to waist; lifting more than 4.5 pounds from waist to overhead height; carrying more than 4.5 pounds using both hands; carrying more than 30 pounds in the left arm only; carrying more than 20 pounds with the right arm only; pushing and pulling more than 10 force pounds; object handling or manipulation using the right wrist and hand (R. 272).  Isometric wrist strength testing revealed that Plaintiff's left forearm supination was 68% stronger than the right, and left forearm

pronation was 63% stronger than the right (R. 273). The treatment plan consisted of education and training to increase tolerance to advanced ADLs (R. 273-274). Plaintiff's rehabilitation potential was guarded (R. 274).

On October 6, 2005, because of Plaintiff's crying spells, Plaintiff's primary care physician started her on Celexa, 20 mg (R. 278). By November 1, 2005, Plaintiff felt much better on the medication (R. 277).

A March 14, 2006 physical examination by Dr. Shapiro revealed continued tenderness at the TFCC region, as well as subcutaneous atrophy at the base of the fifth metacarpal with a resulting prominence of the bone. Dr. Shapiro noted a possible re-tear of the TFCC. He rejected the idea of further cortisone injections, and informed Plaintiff of possible surgical options. Different techniques than what was used before were discussed, including trans-osseous sutures and a new product that was being developed. Plaintiff was not interested in the trans-osseous repair technique as described by Dr. Shapiro, and was put on the waiting list for the new procedure (R. 275).

### 3. *Vocational Evidence*

VE Turecki characterized Plaintiff's past work as an auto assembler as an unskilled occupation performed at the medium exertion level. The VE indicated that Plaintiff's past work as a retail sales supervisor was a semi-skilled occupation with a light exertion level (R. 116, 303). She defined the geographic region at issue as Southeast Michigan within a five-county radius (R. 303).

ALJ Jachnycky asked VE Turecki to consider an individual of the same age, education, and work experience of Plaintiff who can lift a maximum weight of 10 pounds with her left hand,

using her right hand only to assist; cannot lift any weight overhead; can sit for six of eight hours in a normal eight-hour workday; can occasionally bend or stoop; cannot climb stairs or reach above shoulder level; cannot work in the vicinity of heights or moving machinery; cannot do any repetitive work, gripping, firm grasping, or fine manipulation with her right hand; can occasionally do simple grasping with her right upper extremity; and can perform jobs entailing only simple, routine, unskilled work (R. 304-305). VE Turecki testified that this hypothetical person would be unable to perform any of Plaintiff's past relevant work (R. 305). ALJ Jachnycky then asked VE Turecki if there were any jobs in the region that this hypothetical person would be able to perform. The VE stated that this person would be able to perform two sedentary, unskilled jobs available in the region. The first was information clerk, of which there were 1,000 jobs in the region. The second was surveillance system monitor, of which there were 1,500 jobs in the region (R. 305).

When asked to assume that this hypothetical person had severe outbreaks of pain that required her to lie down twice a day for 20 minutes to one hour, VE Turecki testified that this limitation would preclude all competitive employment (R. 306).

### 4. *The ALJ's Decision*

ALJ Jachnycky found that Plaintiff met the insured status requirements of the Social Security Act through October 24, 2006, the date of his decision, and had not engaged in substantial gainful activity since July 21, 2003, the alleged onset date (R. 17). Plaintiff's history of right wrist pain, secondary to ligament tear with surgical repair, hypothyroidism, vascular surgery for varicose veins, and depression qualified as severe impairments (R. 18). Yet, the

impairments did not meet or equal the requirements of any impairment listed in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526) (the "Listing"). ALJ Jachnycky concluded that Plaintiff had not been under a "disability" within the meaning of the Act at any time from the alleged onset date through the date of his decision (R. 22).

ALJ Jachnycky evaluated the functional limitations resulting from Plaintiff's depression in four areas, as required by 20 C.F.R. § 404.1520a (R. 18). The ALJ found that Plaintiff's depression caused at most mild restrictions of her activities of daily living; no difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence and pace; and no episodes of decompensation. In so finding that Plaintiff had only mild limitations of activities of daily living, the ALJ noted that she was the primary care provider for her three-year-old son. In so finding that Plaintiff had moderate difficulties in maintaining concentration, persistence and pace, the ALJ relied heavily on Plaintiff's testimony, as well as the treatment notes from October 6, 2005, indicating that Plaintiff experienced crying spells, worries and loss of several interests (R. 19, referring to R. 278).

ALJ Jachnycky found that Plaintiff had the physical residual functional capacity (RFC) to lift ten pounds occasionally, with the left hand only; perform no lifting with the right hand, but use of the right hand to assist the left; perform no lifting overhead with either upper extremity; sit for six hours in an eight-hour workday; stand/walk for six hours in an eight-hour workday; perform occasional bending and stooping, but no climbing stairs; perform no reaching above shoulder level; perform no work at hazardous heights or around moving machinery; perform no repetitive work with the right hand; perform no fine manipulation with the right hand; perform simple grasping with the right hand, but only on an occasional basis; and perform only simple,

routine, unskilled work. In reaching this finding, the ALJ considered Plaintiff's allegations and found them not fully credible because they were not fully supported by the objective medical evidence (R. 19). The ALJ found, based on the VE's testimony, that although Plaintiff was unable to perform her past relevant work, there were a significant number of jobs in the economy which Plaintiff was capable of performing (R. 21). ALJ Jachnycky thus concluded that Plaintiff was not disabled.

## II.     ANALYSIS

### A.     Standard of Review

In adopting federal court review of Social Security administrative decision, Congress limited the scope of review to a determination of whether the Commissioner's decision is supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Sherrill v. Sec'y of Health and Human Servs.*, 757 F.2d 803, 804 (6th Cir. 1985). Substantial evidence has been defined as "[m]ore than a mere scintilla;" it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389 (1971) (*quoting Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). The Commissioner's findings are not subject to reversal merely because substantial evidence exists in the record to support a different conclusion. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984).

If the Commissioner seeks to rely on vocational expert testimony to carry the burden of proving the existence of a substantial number of jobs that Plaintiff can perform, other than her past work, the testimony must be given in response to a hypothetical question that accurately describes Plaintiff in all significant, relevant aspects. A response to a flawed hypothetical

question is not substantial evidence and cannot support a finding that work exists which Plaintiff can perform.  *See, e.g., Varley v. Sec'y of Health and Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987) (a hypothetical question must accurately portray claimant's physical and mental impairments); *Cole v. Sec'y of Health and Human Servs.*, 820 F.2d 768, 775-6 (6th Cir. 1987) (Milburn, J., dissenting) ("A vocational expert's responses to hypothetical questions may constitute substantial evidence only if the questions posed accurately portray the claimant's impairments."); *Bradshaw v. Heckler*, 810 F.2d 786, 790 (8th Cir. 1987) ("The question must state with precision the physical and mental impairments of the claimant."); *Myers v. Weinberger*, 514 F.2d 293, 294 (6th Cir. 1975); *Noe v. Weinberger*, 512 F.2d 588, 596 (6th Cir. 1975).

    B.    <u>**Factual Analysis**</u>

In her motion for summary judgment Plaintiff argues that she should be granted benefits because (1) substantial evidence did not support ALJ Jachnycky's decision that Plaintiff is not disabled (Dkt. #11, pp. 9-12);[4] and (2) that the ALJ erred in concluding that there were a significant number of jobs in the region that she was capable of performing because the hypothetical question he asked the VE was defective (Dkt. #10, pp. 12-14).

    1.    *<u>Plaintiff's Impairments</u>*

In order to qualify for disability benefits, Plaintiff initially bore the burden of proving that she suffered from medically severe impairments that lasted or could be expected to last for a

---

[4] Unless this Court finds the proof of disability to be overwhelming, or the proof of disability is strong and there is a lack of evidence to the contrary, the correct remedy would not be to award judicial benefits, but rather remand for further proceedings.  *See Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

continuous period of at least twelve months. 42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A); 20 C.F.R. §§ 404.1508, 404.1520(c), 404.1521; *Higgs v. Bowen*, 880 F.2d 860 (6th Cir. 1988). Impairments are "severe" if they significantly limit a claimant's ability to perform basic work activities.[5] 20 C.F.R. § 404.1521(b).

An impairment qualifies as not severe when it does not affect the claimant's ability to do basic work activities, regardless of age or vocational background. *Bowen v. Yukert*, 482 U.S. 137, 152 (1987); *Higgs*, 880 F.2d at 862; *Salmi v. Sec'y of Health and Human Services*, 774 F.2d 685, 691 (6th Cir. 1985); 20 C.F.R. § 404.1521(a). In the present case, the ALJ found that Plaintiff had "severe" impairments consisting of a history of right wrist pain, secondary to ligament tear with surgical repair; history of hypothyroidism; history of vascular surgery for varicose veins; and depression. The ALJ, however, concluded that none of the impairments were "severe" enough to meet or medically equal, either singly or in combination, one of the impairments in the Listing (R. 18).

Plaintiff argues that the ALJ erred in concluding that she was not disabled because the ALJ mischaracterized the evidence (Dkt. #11, pp. 9-12). Plaintiff cited to the initial assessment by Ms. Waterstradt, in which Ms. Waterstradt reported that Plaintiff's problems included pain, increased edema, decreased range of motion, decreased strength, and decreased ability to accomplish certain ADLs (Dkt. #11, p. 9, referring to R. 268), as well as Dr. Shapiro's assessments of continued pain and a possible re-tear of the TFCC (Dkt. #11, p. 9, referring to R.

---

[5] Basic work activities include: (1) physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; (2) capacities for seeing, hearing, and speaking; (3) understanding, carrying out, and remembering simple instructions; (4) use of judgment; (5) responding appropriately to supervision, co-workers, and usual work situations; and (6) dealing with changes in a routine work setting. 20 C.F.R. § 404.1521(b).

270, 275).

"Although required to develop the record fully and fairly, the ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered." *Simons v. Barnhart*, 114 Fed. Appx. 727, 733 (6th Cir. 2004) (*quoting Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000)). Contrary to Plaintiff's contention, the ALJ considered the record evidence and found that it did not support the alleged severity of Plaintiff's pain (R. 19-20). For instance, the ALJ considered that Plaintiff's current treatment consisted solely of wearing a wrist brace and taking ibuprofen (R. 295, 297). Additionally, Plaintiff's decision to forgo surgery and instead wait to see if a new product would be developed allowed the ALJ to infer that Plaintiff's pain was not so excruciating as to be disabling (R. 20, 275).

The ALJ, in referencing S.S.R. 96-2p (R. 19), considered the reports of Plaintiff's treating sources, though he did not specifically enumerate all of Plaintiff's allegations of pain, nor the underlying medical condition (R. 19-20). This decision may reflect some of the adverse consequences of the hearing judge falling further and further behind in the increasing number of disability claims. While the above review of the medical evidence has three pages of data from 2004, ALJ Jachnycky makes scant mention of that medical history. Nonetheless, he proceeded to find that Plaintiff retained the RFC to lift 10 pounds occasionally, with the left hand only; perform no lifting with the right hand, but use the right hand to assist the left; perform no lifting overhead with either upper extremity; sit for 6 hours in an 8-hour workday; stand/walk for 6 hours in an 8-hour workday; perform occasional bending and stooping, but no climbing stairs; perform no reaching above shoulder level; perform no work at hazardous heights or around

moving machinery; perform no repetitive work with the right hand; perform no fine manipulation with the right hand; perform simple grasping with the right hand, but only on an occasional basis; and perform only simple, routine, unskilled work (R. 19). In reaching this finding, it is assumed ALJ Jachnycky considered all of the objective medical evidence; he specifically refers to the report of Dr. Shapiro indicating Plaintiff retained a full range of motion in her wrist as well as 5/5 grip strength (R. 20, referring to R. 270). See also R. 265 and 266, Therapist Waterstradt's notes on normal range of motion and a fair to good prognosis. The ALJ again refers to a portion of Dr. Shapiro's medical record that is missing from the record as noting that Plaintiff was "doing well, without complaints" four weeks after her January 2004 wrist surgery (R. 19, referring to Exhibit 3F, p. 16, which record exhibit is only three pages – R. 260-262). The ALJ's RFC conclusion was even more restrictive than the assessment done by Ms. Wills (R. 20, 272-274).

In regards to credibility, the ALJ is not required to accept a claimant's own testimony regarding allegations of disabling pain when such testimony is not supported by the record. *See Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987). The ALJ must, however, do more than say the testimony is not credible based on generalities or merely recount the medical evidence and claimant's daily activities and then, without analysis, summarily conclude that the overall evidence does not contain the requisite clinical, diagnostic or laboratory findings to substantiate the claimant's testimony regarding pain. *Felisky v. Bowen*, 35 F.3d 1027, 1039 (6th Cir. 1994). In order for an ALJ to properly discredit a claimant's subjective testimony, the credibility determination must be accompanied by a detailed statement explaining the ALJ's reasons. ALJ Jachnycky refers to SSR 96-7p, which directs that findings on

credibility cannot be general and conclusory findings, but rather they must be specific. His specifics are thin, noting Plaintiff's limited treatment for depression being Celexa and for her wrist, ibuprofen (R. 20). He found nothing to justify her needing to lie down for 20 to 60 minutes twice a day.

ALJ Jachnycky had substantial evidence to discredit Plaintiff's testimony regarding the severity of her pain. In addition to the reports submitted by Dr. Shapiro and Ms. Waterstradt noted above, the ALJ could have referred to the initial assessment from April 12, 2004, by Physical Therapist Moran which stated that Plaintiff played softball and golf (R. 264). This is clearly inconsistent with Plaintiff's claim that her pain was such that she found it necessary to lie down twice a day and could not lift a coffee cup. While this evidence is highlighted by the Commissioner's Regional Counsel and not mentioned by the ALJ, it likely would be were this Court to remand for more specific credibility findings. While ALJ Jachnycky should have been more specific on the reasons he used to disregard Plaintiff's testimony concerning her level of pain, he had a reasonable basis for his credibility finding. Therefore, it is recommended that ALJ Jachnycky's determination not be overturned on this ground.

### 2. *The ALJ's Hypothetical Question*

Plaintiff argues that the ALJ erred by finding that even though Plaintiff was unable to return to her past relevant work, there existed jobs in the national economy which she was capable of adjusting to, thus she was not disabled (Dkt. #11, pp. 12-14). "In order to support a finding that you are not disabled . . . we are responsible for providing evidence that demonstrates that other work exists in significant numbers in the national economy that you can do, given your residual functional capacity and vocational factors." 20 C.F.R. § 404.1560(c)(2). "Work exists

15

in the national economy when there is a significant number of jobs (in one or more occupations) having requirements which you are able to meet with your physical or mental abilities and vocational qualifications." 20 C.F.R. § 404.1566(b).

Plaintiff argues that the ALJ's erroneous finding was based on the VE's testimony in response to the ALJ posing a defective hypothetical question to the VE (Dkt. #11, p. 12). Although the ALJ asked the VE to consider a hypothetical person suffering from depression including concentration difficulties, Plaintiff points out that no mention was made of Plaintiff's crying spells (*id.*, referring to R. 304-305). Plaintiff also argues that because she has difficulty writing, she would be precluded from one of the job of Information Clerk. Because of this, the only other job mentioned by the VE, Surveillance System Monitor, does not exist in "significant numbers" in the region to direct a finding of not disabled (Dkt. #11, p. 13). Additionally, Plaintiff's need to lie down twice a day would preclude all employment (Dkt. #11, p. 14).

The ALJ's hypothetical question did not specifically mention crying spells as one of the conditions the VE had to consider, because the ALJ is entitled to determine what the claimant's impairments are, and he apparently discounted the frequency of crying spells as well as Plaintiff's claimed need to lie down twice a day. The ALJ considered Plaintiff's depression and concentration difficulties when making his decision, but he could legitimately discount the claimed severity of her depression because Plaintiff's only method of treatment was taking Celexa, after which she was reported as "feeling much better" (R. 20). There is nothing in the record that indicates Plaintiff ever sought on her own – or it was recommended by a physician that she seek – any type of psychiatric treatment, including psychotherapy. It was her primary care physician, and not any psychiatrist, who prescribed the Celexa. Additionally, Plaintiff's

crying spells are a symptom of her depression, and not a distinct impairment that must be considered separately, and the record is such that a reasonable fact finder could discount their alleged frequency.

Contrary to Plaintiff's assertion that the ALJ failed to take into account the difficulty Plaintiff had with writing, the hypothetical question included the limitation that she could "do no fine manipulation with respect to her right hand" (R. 305). Even if this limitation precluded Plaintiff from performing one of the jobs mentioned by VE Turecki, 1,500 jobs in a five-county region would, in this circuit, be considered a "significant number" of jobs. *See Hall v. Bowen*, 837 F.2d 272, 275 (6th Cir. 1988) (1,350 jobs in a nine-county area is a "significant number").

The ALJ determined that there was no objective medical evidence that indicated a need for Plaintiff to lie down twice a day for 20 to 60 minutes to relieve her pain, and he disputed her credibility on this claim (R. 19-20). This ALJ credibility finding should be afforded substantial deference. *Jones v. Commissioner of Social Security*, 336 F.3d 469, 477 (6th Cir. 2003).

ALJ Jachnycky found that Plaintiff had the RFC for activities for a limited range of sedentary work, because he limited her to lifting 10 pounds only with her left hand. Physical Therapist Willis found Plaintiff could carry 30 pounds with her left arm and 20 with her right. If Plaintiff could perform a full range of sedentary work the Medical-Vocational Guidelines would direct a finding of not disabled. *See* 20 C.F.R. pt. 404, subpt. P, appendix 2, rule 201.25. Again, the ALJ based his decision on vocational evidence and only used the Medical-Vocational Guidelines as a framework for his decision (R. 23)

While the ALJ's decision could be improved, this Court should still affirm the Commissioner, because the record is sufficient to uphold the ALJ's findings that Plaintiff was

not disabled. *See NLRB v. Wyman-Gordon*, 394 U.S. 759, 766 n.6 (1969), quoted in *Wilson v. Commissioner of Social Security*, 378 F.3d 541, 547 (6th Cir. 2004) (where "remand would be an idle and useless formality," courts are not required to "convert judicial review of agency action into a ping-pong game"); *see also Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir. 1989) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.").

### III.   RECOMMENDATION

For the reasons stated above, it is **RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and Defendant's Motion for Summary Judgment be **GRANTED**. The parties to this action may object to and seek review of this Report and Recommendation, but are required to file any objections within ten (10) days of service or a copy hereof as provided for in 28 U.S.C. § 636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Howard v. Sec'y of Health and Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity, will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Sec'y of Health and Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the Court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

Dated: July 29, 2009                  s/Steven D. Pepe
Ann Arbor, Michigan                United States Magistrate Judge

I certify that a copy of the foregoing document was served on all parties and counsel of record via electronic and/or U.S. Mail.

                                           s/Diane Opalewski
                                           Case Manager